### LEE v. GULF, C. & S. F. RY. CO.

### No. 9075.

Court of Civil Appeals of Texas. Austin.

Dec. 17, 1941.

J. Tom Higgins, of Lampasas, and Joe Burkett, of San Antonio, for appellant.

Terry, Cavin & Mills, of Galveston, Walker & Hammett, of Lampasas, and Wren & Jeffrey, of Fort Worth, for appellee.

McCLENDON, Chief Justice.

About mid afternoon on March 7, 1939, appellant, Lee, was traveling north on Avenue D in the northern portion of the City of Lampasas, in a "Model A Ford pick up", when he was forced off the roadway by a car traveling in the opposite direction. His car ran into a ditch on the east side of the road, and tilted over, resulting in personal injuries to himself, and property damage to his car. The ditch at the place of the occurrence was within the area comprizing the intersection of Avenue D and the right of way of appellee railway company, and Lee sued the company for compensatory damages upon the theory of negligence on its part in having the uncovered ditch at that place, and permitting a growth of weeds that concealed it from view; and upon the further theory that it was the statutory duty of the company to maintain the crossing in safe condition for vehicular traffic for the full width of the public street, which duty it failed to perform. The trial was to a jury, and the judgment was in favor of the company upon a verdict directed at the close of Lee's evidence. Lee has appealed, assigning as error the action of the court in directing a verdict.

State highway No. 66 (now Federal highway No. 281) was routed over that portion of Avenue D here involved. At

this point the highway was about 60 feet wide, ran practically north and south and was intersected by the company's main line track approximately at right angles, the company's right of way being about 100 feet wide. The record does not disclose whether the existence of the right of way antedated that of the highway. On each side of the highway the company's right of way was fenced, the distance between the fences being about 73 feet. On the east highway line, the north and south corner posts of the right of way fence were 45 feet and 35 feet respectively from the center of the main line track; and about 40 feet north of the north corner post a road branched off toward the east from the highway. About 65 feet south of the main line track the company had a Y track crossing the highway. The highway was graveled or paved in the center for a uniform width of 22 feet, both north and south of and across the right of way, which 22-foot way constituted the traveled portion of the highway. About 40 feet north of the main line track there was and had been for many years a wooden culvert 49 feet long extending underneath the roadway. The east end of this culvert was 9 feet from the east edge of the graveled roadway. There was a ditch or drain on either side of the highway both to the north and south of the company's right of way to carry off the surface water. The general slope of the terrain is toward the southeast, and the waters from the west ditch north of the culvert passed out through the culvert, joined those from the east ditch and together they flowed off toward the east, there being a small retaining embankment for that purpose extending eastward from the south side of the east end of the culvert. The ditches on either side of the highway were about 10 feet from the edge of the graveled roadway. The roadway across the right of way was of the same character and width as that to the north and south. There is no contention that it was not in every way adequate to meet the needs of the traveling public, both in construction and state of repair. All of these physical conditions had existed many years; and Lee had a general familiarity with them from an almost daily use of the highway for about three years

Lee's version of the accident, while somewhat confused or obscure in some details, was substantially as follows: When he was about 40 feet of the Y track he observed a car approaching from the north, traveling at what he called a rapid rate and zigzagging across the highway. It was then north of the main line track. He slowed up his car practically to a standstill at the Y track. The other car then appeared to be headed for a road leading off to the west. He then "shot the gas" to his car and proceeded north. The other car then swerved back toward him and he was forced off the roadway just north of the main line track. He then proceeded north toward the road branching off to the east and his car struck the embankment, the front wheels dropping into the ditch to the east of the culvert and the car tilted over with the resulting damage. It is not altogether clear whether he voluntarily chose this route after he was forced off the roadway. Upon this point we quote the following excerpts from his testimony: "When I came to the main line she (the driver of the other car) whipped around and came straight to me and I headed across the main track, and the way she was going, that looked perfectly level except a rise and I seen no ditch, and I passed it for three years and never seen one, and I thought I would cut across to that (the road branching off to the east) and when I did my wheels dropped off, and it left the car sitting in about this shape. When I was crossing the main line track and proceeding northward after I began to get away from the on- coming car, I was going not over six or seven miles an hour." "At the time I came off the east side of the used portion of the street, I don't think I was making over six or seven miles; I stopped plum still before I got to the ditch; I did not see the ditch until the wheels dropped off—the front wheels." As soon as I got started and about half the distance between the Y and main line, I saw she wasn't going that way; I thought I would come across this edge of the main line, across to the next street. She was coming down at this undiminished speed and I was coming up from a stopped position; she got in a little ahead of me at the main line; I had to pull over here and she passed me; she got to the main line first and I pulled over and across it right in behind her; I was just about the main line when she came by me; I was mighty near to the main line when I seen her head to the main line and I just shot on across; I didn't have time to go around." "As to whether she beat me to the main line a little

bit, there wasn't very much difference." "Where I was with respect to the main line when she passed me, it all happened right there, so when I was on the main line, she was coming toward it.—I guess I got over it first,—I don't remember; I couldn't say which one got over the main line first." "At the time she came by me both of us weren't on the gravel surface; I quit it just over the main line; she was passing when I quit the gravel portion of the road; I had to cut across the rails a little to make it in there and then I looked ahead and it looked like it was smooth, and then I thought I would go across that way; she didn't bother me when I looked across there and it looked smooth; she was where I ought to have been and I was out of the road. After she got by I was not in position to turn back if I wanted to; I was about across the track and it was rough and it looked perfectly smooth,—you couldn't see any ditch at all, and I shot across it."

We will not attempt an analysis of this testimony to determine whether it shows conclusively that Lee voluntarily chose to drive to the east of the culvert after he had been crowded off the road, or whether it will support the theory that he was actually forced into the ditch by the oncoming car. In the view we take of the case it is not material which theory is adopted. For our present purposes we will assume that the evidence would support a finding upon either theory.

Clearly the company was in no way responsible for Lee's turning aside from the graveled portion of the roadway and his attempt to drive around the eastern end of the culvert, regardless of whether his action in that respect was purely voluntary on his part or forced upon him by the on-coming car. The company's liability is dependent solely upon whether it owed to Lee, as a member of the public traveling by motor vehicle, the duty to construct and maintain that portion of its right of way to the east of the culvert in reasonably safe condition for that character of traffic. The uncontradicted evidence as above summarized, negatives such duty.

We have two statutes prescribing the duty of railroads in the construction and maintenance of that portion of their rights of way at the intersection of public highways,—R.C.S. Arts. 6320 and 6327. The former relates to the crossing by railroads of highways already in existence, and requires that the company "shall restore the * * * street, highway, plank road, turnpike * * * thus intersected * * * to its former state, or to such state as not to unnecessarily impair its usefulness, and shall keep such crossing in repair." The latter relates to crossings of highways established subsequently to the railroad and requires that the company "shall place and keep that portion of its roadbed and right of way, over or across which any public county road may run, in proper condition for the use of the traveling public." There is no essential difference in the duty thus imposed under either statute, which duty is that generally recognized in the absence of statute. 51 C.J., p. 657, § 347 and notes 10 and 11.

The contention of appellant is that the duty thus imposed required the railroad to maintain the crossing for the full width of the highway right of way and every portion of it in a safe condition for vehicular travel. Such contention is not tenable. Proper drainage is an essential element in highway construction and maintenance. The ditches on either side of the highway to the north of the railroad were placed there and maintained by those having in charge the construction and maintenance of the highway. The company was not responsible for them in any sense. Through them the water was brought to the railroad right of way, and it was the duty of the company to provide for its disposition. There is no suggestion in the record that the manner in which it did so was improper. Since the natural drainage was to the southeast, the culvert was a necessity to take the water flowing down the west side of the highway across the roadway, and the so-called embankment was necessary to continue the flow of that water and to divert the flow of that coming down the east ditch toward the east. It is apparent that the very necessities of the situation required the doing of just what was done in this instance, and that the full duty imposed upon the railroad to maintain the highway in a reasonably safe condition for the traveling public; and in such condition as not to unnecessarily impair its usefulness had been met.

Appellant cites the following authorities, which we have examined. None of them supports his contentions. Gulf, C. & S. F. Ry. Co. v. Woods, Tex.Civ.App., 262 S.W. 229; Id., Tex.Civ.App., 283 S.W. 859; Id., Tex.Com.App., 290 S.W. 729; Galveston, H. & S. A. Ry. Co. v. Rodriguez, Tex.Civ.

App., 281 S.W. 259; Id., Tex.Com.App., 288 S.W. 151; Dallas & G. Ry. Co. v. Able, 72 Tex. 150, 9 S.W. 871; Missouri Pac. Ry. Co. v. Speed, 3 Tex.Civ.App. 454, 22 S.W. 527; Missouri, K. & T. Ry. Co. v. Gillenwater, Tex.Civ.App., 146 S.W. 589; Gulf, C. & S. F. Ry. Co. v. Sandifer, 29 Tex. Civ.App. 356, 69 S.W. 461; International & G. N. Ry. Co. v. Butcher, Tex.Civ.App., 81 S.W. 819; San Antonio & A. P. Ry. Co. v. Bowles, 88 Tex. 634, 32 S.W. 880.

The trial court's judgment is affirmed.

Affirmed.